Again, take all the time you need to come up. Case number 20-12960, Consolidated with 20-14251, Javier Garcia-Bengochea v. Carnival Corporation. Case number 20-12960, Consolidated with 20-14251, Javier Garcia-Bengochea v. Royal Cribbean Cruises, Javier Garcia-Bengochea v. Royal Cribbean Cruises, Ltd.) On behalf of Dr. Garcia-Bengochea, my plan had been to talk mainly about this, the bar in subparagraph AB4 of section 602, but given what I heard in the earlier argument, I am going to go into the standing to try to address some of the questions I heard before. Certified claims are different than uncertified claims. The owner of a certified claim, by definition, must have been and always has been an American. In contrast, by definition, the owner of an uncertified claim, as is in all the other cases, including the one you heard earlier this morning, at the moment of confiscation, must have been either a non-American or an American who forfeited his claim by failing to seek certification or because his request for certification was denied. Lacking a certification, a party prosecuting an uncertified claim, unlike the one here, must establish with well-pleaded facts that the non-American who owned the claim at the moment of confiscation somehow Americanized that claim before March 12, 1996. What do I mean by Americanized? Well, before 1996, an American must have owned the claim. For example, the original non-American owner, a Cuban who lost his property to Castro, could have become a naturalized American before 1996, or he could have transferred ownership of that claim to an American before 1996. In each of the cases that the cruise lines have cited, Gonzalez from this court, on which Judge Jordan was a member and was an unpublished decision, and Glenn from the Fifth Circuit, the persons prosecuting the uncertified claims failed to plead facts showing pre-1996 American ownership of that claim. In contrast, here, the records of the United States government of the Foreign Claims Settlement Commission show an as the owner today. Under section 60A3, subsection A1, this court, quote, shall accept as conclusive proof, end quote, this evidence of ownership from the commission's records. I want to stress, just to go into the facts of the Gonzalez case, which is an unpublished decision from this court, the district court in that case, and I'm quoting from page two of the Westlaw site, the complaint in Gonzalez does not contain allegations demonstrating Gonzalez's ownership in compliance with subparagraph A4B. For example, the complaint lacks allegations regarding when Gonzalez inherited the claim from his grandfather. When Gonzalez became a United States citizen, if Gonzalez's grandfather was a United States citizen, and if so, when Gonzalez's grandfather became a citizen. Without these allegations, Gonzalez has not sufficiently alleged he has an actionable ownership interest. Here, we attach to the complaint Albert's certified claim, which makes it fundamentally different from all these cases dealing with at the time the properties were confiscated, Glenn's mother and aunt were Cuban nationals. Glenn alleges that he inherited an ownership interest in some of the properties when his aunt passed away in 1999, and the rest when his mother passed away in 2011. So in sum, this court can rule in favor of my client and not create any conflict with the Fifth Circuit or its own that I might just not be following this. But when you stood up, you said, I thought I was going to stand up and talk about A4B, but instead, given what happened in the earlier argument, I need to talk about standing. And I just don't yet think I understand how any of what you just said connects to standing. I'm going to get to standing next. I wasn't going to address it at all unless you had a question. Fine. Okay. I see. I just wanted to make sure that I wasn't supposed to be connecting this A4B piece to the standing. You're currently assuming standing and arguing what I'll call the So then can I ask you just a couple of questions about this? Because one thing that the other side beat you up about in its brief is that Albert really wasn't ever front and center in the district court, right? Wasn't named in the complaint. You never said to the district court that Mr. Bengachayo was Albert's representative. Albert wasn't in the Certificate of Interested Parties. So he's never really been front and court. Is that fair or unfair? That's fair. And we addressed that in our reply brief in parts two and three. And I actually found one case we rely upon is the Yi case from the Supreme Court. Yeah. I mean, I wonder if we're really stressing Yi. I understand Yi. And Yi says, look, parties waive issues and positions and not arguments. And within issues and positions, the arguments can evolve. But boy, this seems like there's a spectrum between sort of pure issues on the one hand and, say, case citations at the other. This seems to be kind of stressing the Yi proposition to me. Okay. Well, Yi is more than just case citations. Oh, I know. I know. Okay. And your own in Preston and Foothill. Yeah. This is why I say I know Yi well. I'm an endorser of Yi. I just wonder if we're stressing the distinction. Right. Well, the other point I would make is, and we cite this both from inside the circuit and outside, that parties are required to plead facts, not plead legal theories. And the defense has argued the opposite. And if you hold that, you'll be in conflict with several circuits. And I cited a case from the Southern District of And the facts are all here to support this legal argument. They are in the certified claim that was attached to the complaint and that the defendants argued correctly below the district court had to consider. And they're also in the papers that the defendants submitted in conjunction with, we're not here on 12B6, we're here on Rule 12C, motion for judgment on the pleadings. The defendants padded the pleadings with all these facts. And so if you look at all these facts, Albert is the owner of the claim. And that's what the United States government says. And all that my client can be is the legal representative of Albert. There are extensive regulations. What do you do with the such claimant language? Such national language? Well, as we pointed out, the applicable United States national must be the certified claim owner. And therefore, Albert was a United States national. He was an American, World War II veteran. He was the certified claim owner. He is now dead. His heirs as the legal representative can bring the claim. No different than an estate. The regulation allows heirs to bring it. And it makes sense. You might imagine it's difficult to reopen a 1972 estate. And therefore, my client is no different than an executor of an estate. And so the national, your Judge Jordan, is Albert, not Dr. Garcia Bengocea. And if you look at . . . But he's not the national bringing the action. He is on behalf of Albert. He . . . Well, he . . . It seems to me that's just . . . Well, I . . . Too much work for that language. Well, Your Honor, I point to four in our reply. Use . . . You can use . . . Okay, let's use A for B. Right. Just for starters. In the case of property confiscated before March 12th, 1996, and this doesn't go to the acquire thing yet. We're not there yet. A United States national may not bring an action under this section on a claim to the confiscated property unless such national acquires ownership of the claim before March 12th, 1996. So you're . . . It seems to me that there's an identity between the national at the front end and a national at the back end, and that they have to be one and the same. Am I right about that? I agree. I agree. And it's Albert. But Albert's not bringing the claim. Yet his legal representative is. What if Albert was alive today but was disabled? Would we say that his guardian was bringing the claim? No. We would say Albert was bringing the claim. I would agree with you there. That's because Albert's still around. But this is the same . . . This regulation is actually the same regulation and the same . . . I think you're right about that. Your Honor, I just want to point this out. If you go to 1620C.C.1 and the accompanying regulation, it applies to both deceased persons and disabled persons. So if you think I'm right about disabled, then I think you have to think I'm right about deceased persons, too. And the reason is these . . . The Treasury Department . . . But the thing is that in the scenario you just gave me with Albert being alive but incompetent, the representative is not suing for himself. He's suing for Albert. And whatever the representative gets, the guardian, the whatever, is flowing to Albert. Here, whatever Javier gets is not flowing to Albert because Albert, unfortunately, is no longer with us. I got 50 seconds. I think I'm over, it looks like. No, don't . . . And I didn't get to the standing part that I had promised. This case is not going to have any time restrictions of the normal sort. So just go ahead and answer. We're going to give you time to address . . . Well, as we . . . I would just point . . . . . . for Mr. Singer. I would point the Court that it's no different than an executor bringing a claim on behalf of the estate. The money will go into the estate and then the estate figures out who it gets distributed to. Here, what the regulation allows, which is common sense given the passage of time and difficulty involved in reopening, and we have tried in reopening a 1972 estate in the state of New York, is you allow an heir rather than an executor of the estate to bring the claim. And I would ask you, Judge Jordan, if we had an executor here, would you be taking the same position? That somehow we were bringing the claim for somebody other than Albert? I don't think so. And so here we just have an heir rather than an executor. And the regulation allows that for common sense reasons. What's the regulation that you said treats the disabled and the deceased the same way? What's the statute that does it, Your Honor? If you go to 1620 C.C.1, Title 22, 1620 C.C.1, it says if any person to whom any payment is to be made pursuant to this subchapter is deceased or under a legal disability, then from that regulation, I'm sorry, from that statute, the Treasury Department wrote a regulation, which is 31 CFR Section 250.4, and it has a provision of the regulation that deals with deceased persons, which we rely upon with this subsection B. But that's for the claim certification process? This is for payments. Yes, this is under the if Cuba were to pay the claim today, pay the certified claim, this is how payment would be made by the Treasury Department to the certified. I understand that you can't, well, I think that you can't look at the Helms-Burton Act without at least taking into account how the Claims Act works. I think you're right on that personally. I think you're right on that, that it has some bearing. But I'm not sure that you can take a statute that defines terms in that Act and transport them here. Well, I don't, I think you have to, Your Honor, because otherwise, as we pointed out in the brief, approximately 5,000 of the certified claimants are individuals, and no one lives forever. And therefore, Congress completely understood that there would be errors bringing claims. The purpose of this provision here that's been relied upon to bar the case here was to prevent foreign-owned claims, because we nobody knew how many Cubans had claims or other citizens who lived in Cuba at the time, and preventing them from transferring the claim to an American corporation or entity. And so that is the And I just, on the same point, on the United States National, I would just urge the Court to look at page 31 of our reply brief, and we lay out from there to page 33 four other provisions in the Libertad Act that use the term United States National that must be talking about Albert. And they are, first, the Court shall accept conclusive ownership of an interest in a, the one I started with, that you have to look at the certified claim to determine who the owner is. The records of the Commission today still list Albert as the owner. The second one is, an interest in property for which a United States National has a claim certified under the Claims Act may not be the subject of a claim and an action under this section by any other person. The, that bars anybody but Albert from bringing the claim. However, as we argue in the brief, the sensible reading is Albert's legal representative can bring it. All right, last, last question to make sure I understand your position on the other point, on the acquire inheritance point. As you read that sort of interaction between A4B and A4C, inherit, you interpret the word acquire to not involve or include inheritance, right? That's number one, right, so far? Yes. Okay. So, everybody, whether you come under A4B or A4C, you can inherit the claim as long as you meet all the other criteria. But if you fall under 4C, then you can't have a transfer for value after the effective date, so you can't go out and sell or purchase the, the claim. That's correct. That's in, in substance, that's a very short summary, but that's the way you read the interaction between 4B and 4C and the way that you interpret the word acquire. Yes, yes. Can I add something? Sure, sure. Almost all, I can't tell you all, but almost all the certified claims fall under B, because Castro, it was 1960, I heard you earlier say 1965, but it was 1960 when most of these takings occurred, and then it was between 67 and 72 when this commission met and certified close to 5,900 claims, 85% of which were individuals, right? So, almost all of the certified claims are going to be under B. Very few of the certified, there are some, but very few of the certified claims fall under C, because they deal with confiscations after 1996. And looking at the whole text and whatever you want to look at for legislative history, that we're not allowed to look at these days, it's very clear. Don't give up on that point at least not with every member of this court. It's in the amicus brief, and it's very clear the concern was the vast, you read this, there were thousands of Americans who lost property, but there were millions of Cubans who did. And so what they said is, we want to make sure that we're only going to do this to help Cubans who have become Americans by March 12, 1996, and who hold that claim. There were many foreign companies that held claims that could have just set up a U.S. entity and transferred them. And that was the purpose of the 4B bar. It was never to bar the certified claims. And I want to point out that the Treasury Department, you can't just transfer a certified claim. But this is going to be endless. But your reading of 4B does not necessarily depend on certified versus non-certified insofar as the word acquires is concerned. It does not. So for example. Right. It might have other ramifications for the case, but not on the acquire thing. Yeah. So for example, if Glenn had put in evidence that, that that, as I said at the beginning, that claim had been Americanized before 1996, had put in evidence that an American owned the claim before 1996, which Glenn did not do, which Gonzales did not do, then, and then it passed to Glenn's heir or Gonzales's heir after 1996, then it would qualify. You haven't heard these arguments in the uncertified, by the uncertified claimants because they don't have those facts. And I believe the law has gotten a little, in the fifth circuit at least, is, is off kilter because there they didn't hear a certified and uncertified case at the same time. But I don't see, I guess one thing I want to stress is it's difficult to see how a certified claim would ever fall under 4B because of the restrictions on transferring that. You mean 4C? Well, either. Because you have, you have a 4, you have a 4B claim. Right. But if you. And it's certified. Yes. But what I meant, let me be clear. You're right, the 4B claim would meet the first clause of 4, I'm sorry, the certified claim would meet the first clause of 4B. Correct. But transferring a certified claim is very difficult. You have to get approval from the government. And it can't be just because you have an heir that that somehow is the acquire. Acquire means to get by one's exertions in the usual sense. And we did go through in our brief, a Judge King, blocked the last definition from the Black's Law Dictionary that relied on a 1923 Merriam case where acquire was modified by a prepositional phrase, by devise. We don't have that here. Congress wasn't intending to limit that here. Okay, Mr. Gowdy, thank you very much. We've taken you over your time. We'll give you your five minutes for rebuttal. I'm sorry I didn't get to the standing points. That's okay. We'll get there. We can get there. You've got some time. May it please the Court, I am Stuart Singer here on behalf of Carnival Corporation, and Council for Royal Caribbean has graciously allowed me to make the entire argument before the appellees. Mr. Singer, it's good to see you again. Can I ask you to, at some point in your argument, can I ask you to address one thing? And that is this, if your view and Judge King's view of the word acquire is correct, how do A for B and A for C make any legislative sense? In the sense, and let me give you my concern, and it may not be dispositive of the case, but it's something that's been bothering me. You would think that individuals who had, that they qualify in every other way, individuals who had, U.S. nationals who had their property taken before March 12th of 1996, are certainly the ones who are going to pass away sooner than people who had property taken after that date. But the way that it seems to me that Judge King read A for B and necessarily then A for C, you allow inheritances for people whose property was taken later, but not for people whose property was taken earlier. And that doesn't seem to make a lot of legislative sense for me, given what Congress was trying to do with this act. I will address that question as the outcome of something we've been thinking and talking about it at some length. Can I ask you just a favor? Would you mind stepping into the microphone just a little bit? I can hear you fine, but I'm not sure it'll get picked up on the audio. This is perfect. Thank you. Of course, the starting point is that the plain language here is, as this court said in Gonzales, is clear and unambiguous, and I think it is. But there is reasons why Congress may choose to do that. If one is looking backward in time from 1996, you have a lot of questions that may come up with respect to the whole process by which claims were, in fact, inherited. In fact, in this very case, there's an issue which Judge King did not reach below that concerned whether Dr. Bengocea ever effectively inherited the claim from Desiderio Perrano. That's not before this court now, but it's an example of how Congress may have wanted a clear rule which would, for claims that go back 20, 30 years, may be more difficult to establish that. Going forward, you know what you have to establish. You keep those records. The second thing which occurs to us is that for the future claims, if confiscation occurs, you'd want to create at least some opportunity for an action to be inherited relating to that claim. Because otherwise, someone just by the fortuity of the claim arising and a person who could bring it immediately dying, there's no opportunity then for that person or a person's heir to act on it. Whereas with respect to the claims in the past, you don't have that same circumstance. So I think there is a rationale as to why Congress would treat this differently. And the important point here, the one of statutory construction, is that because these sections follow one another directly, it shows when Congress wanted to limit the term acquire to acquisitions for value, when it wanted to exclude inheritances, it knew how to do that. And it did that for C and it did not do that for B. And that really is dispositive, I think, in terms of interpreting the legislation. If I might, I'd like to begin with the standing issue and then go back to the issues with respect to the interpretation of acquire and the issue that Judge King reached. It's our view that the appellants lack constitutional standing. And there's around three arguments that I wanted to make in connection with that. The first is I do not think you can divorce the concept of injury, actual injury, and traceability. This Court's cases, the Supreme Court cases, talk about standing in the context of an actual injury caused by the defendant. Or sometimes it uses the term fairly traceable to the acts of a defendant. It cannot be that you can just have an actual injury out there, no matter what that injury is caused by, no matter what sequence of time there is, where causes, of course, have to precede their effects, that that is sufficient and then one satisfies standing and moves on. No, I don't think that that was ever anybody's suggestion, but the Court, you know, till it's blue in the face, has said that there are three components, right? Injury in fact, one, causation, redressability. Causation and redressability, as Judge Jordan noted, oftentimes kind of go hand in hand. Sometimes you can't even tell which of the two factors the Court is adjudicating. But injury in fact does, in a way, sort of stand alone. You address that first and then you move on to address causation and redressability. But I mean, so I guess to a question I had in the earlier argument is why isn't the injury here essentially a tangible, concrete, pocketbook injury that my claimed property is being used in a sense rent-free? And now the question becomes, is that injury traceable to here, the cruise lines? I think if one wants to define that as the injury, one then has to look at the issue of traceability. The cruise lines obviously neither caused the confiscation of property 50 years ago by Fidel Castro, nor did they cause the Cuban government to fail to pay compensation over that period of time to the plaintiffs. So any type of injury then has to be a more theoretical, non-actual, non-concrete injury of the type that one looks at the statute and just as the courts did in Spokane and TransUnion and this court did in Moransky. And I think in those circumstances, one has to ask, is there some sufficient relationship between what the statute seeks to do and some established cause of action? And that's why one arrives there in this case. In fact, I would suggest that in many ways, this case and the statute is more extreme than Moransky or the statutes involving credit reporting and the other cases that have gone down the Spokane line. And that is because here, in those cases, it was unquestionably the defendants did something that caused the plaintiff to be in the situation about which it is complaining. That isn't the case here as the courts recognized the actions and the loss of property, a loss of confiscation were due to the Cuban government occurred many, many years ago. I just want to make sure we're not sort of like mixing categories here because at least as I think I understand them, Spokane and TransUnion and Godiva or Moransky are really first and foremost about injury in fact. And it seems like it doesn't seem to me that you can answer an injury in fact question by saying, yeah, but those there, the defendant didn't cause the injury or here, the defendant didn't cause the injury. I mean, that seems to me sort of like a separate analysis. Well, there were injuries in fact, where there was no question about the alleged injury being traceable to the defendant. So the question was in the context of is the alleged injury in fact concrete enough, particularized enough to meet article three. Here, because the injuries that the plaintiff suffered clearly were not caused by or can be traced to the acts of the defendant. One then I think moves down into these more ethereal issues of whether or not, for example, the cruises to Cuba caused in some way the Cuban government to delay compensation, which there's no, you know, it's entirely speculative and like a whole line of other cases by the Supreme Court says that can't be the basis for standing. And then one gets to questions like trespass and those. And there's a case that wasn't mentioned in the earlier argument this morning that I think is important to consider in looking at this. And that's this court's prior decision in the Club Mediterranean case. Because there you also dealt with the issue of expropriated property by the Cuban government. And this court in that case said that while the Helms-Burton Act and, you know, these expropriations may be wrongful, it doesn't mean they were not effective. That as a result, you do not have a claim for trespass because you do not have a possessory right to the property. You have it wasn't, but I'm trying to look for the case and I think I copied it. But weren't those Cuban nationals who were suing in Club Mediterranean? I would need to check. I don't believe so. I'll check that, Your Honor. No, they are. They are. Prior to this, this is from the first page of the opinion. Prior to the Communist Revolution, Elvira de la Vega Glenn and her sister, Ana Maria de la Vega Glenn, were Cuban citizens and residents who jointly owned and the government expropriated the property. So, I mean, I take your point, but I think under international law, a state's confiscation, expropriation of property against its own citizens is effective. And international law has nothing to say about that. It's not necessarily the case with regard to nationals of other countries, right? I agree that there's a difference in international law on exactly the point Your Honor mentioned. I would note that in the Glenn versus Club Mediterranean case, at the time of the suit, they were both U.S. citizens. Yes, but at the time of expropriation, they were Cuban, right? So, I'm wondering if that mattered to how our panel in Club Mediterranean explained what the Helms-Burton Act was supposed to be getting at. But I can say that it's not something that was mentioned by the 11th Circuit panel in that case. Instead, as looking at the four corners of the opinion, it says that there's no claim for trespass. There's also no claim for unjust enrichment. And that that was what the plaintiffs were seeking to do in that case. And it did not go into some discussion. Well, that's because if they were U.S. citizens at the time of the confiscation, then it would mean that you did not have an effective divestment of the property. Instead of what it characterized Helms-Burton, as you were saying, these may have been wrongful acts, but we're not going to pretend we're not effective. There is no longer a possessory right of ownership that Dr. Bengochea has with respect to the shares of stock or what La Maritima had with respect to the property at the docks of Santiago de Cuba. Well, let me pose the question I posed to the lawyers in the earlier Helms-Burton case. Different set of facts altogether. So this is not this case. But Cuban national, I mean, excuse me, American national, American citizen living in Cuba in 1960 has his or her property confiscated by the Cuban government. Comes to the United States. The United States, instead of passing Helms-Burton, enacts a law which says any American national who had their property wrongfully taken by the Cuban government in the 1960s can now sue the Cuban government for damages in a federal court. We are wiping out the foreign sovereign immunities protection given to the Cuban government for those sorts of claims. And you can sue for the value of the property wrongfully taken. Sort of a takings type of claim. Would that American national have injury in fact? He would have injury in fact caused by the Cuban government and thus there would be standing in that case because the defendant would be the Cuban government. The entity that took his property and caused his injury. Now, if you want, now, now, you say, let me take that answer now and flip the hypothetical a bit. So now the government says you can now go sue every member, assuming you can get process over them, of the Cuban government. Regardless of whether they were alive in government or not at the time of the taking. You can sue them in an American court for the wrongful deprivation of property that occurred back in the 60s. Now, you may not be able to have causation or traceability. Do you have injury in fact? I think you have the same injury in fact there of the loss of the property. But I, and I think even in that circumstance. Even though, even though the, to use your words in a different context earlier, the expropriation confiscation was effective. Yes, I think you still have injury in fact because what you're looking at is you don't have to worry about a common law analog here of trespass. You had a, a taking. You had a government which took the property. You're now simply doing what Congress has done with respect to the anti-terrorism exceptions, the Foreign Sovereign Immunity Act. You're creating an exception so that the plaintiff in that situation could bring suit against the Cuban government. And you are enlarging the definition of Cuban government to include individuals who are parts of that government. So I, I don't think it raises the standing issue which a case like this raises. Where the cruise line defendants, they neither caused the injury. They didn't cause the failure for, for loss of compensation for that injury. What they did is after the Cuban government took effective possession of that property. And that's what Glenn says. That that was an effective change of possession. They then used that property. And now they're being sued for the entire value of that property under a statutory cause of action that bears no relationship to anything that Congress has done before. Or that exists in the common law. In fact, Congress called it in the statute a unique act. And look at the analogs which it's the plaintiff's burden to identify under TransUnion and see how they don't follow. In trespass actions you have a possessory right of interest. In conversion, the defendant has taken over control of the property. In the accessory after the fact cases, those are not situations separated by 50 years. But where the defendant was the person who was, the person acted for in taking property. The viscountress was liable in that suit because the oxen was taken for her benefit. That's why a suit existed. And the same thing is true for the Trespass Act of 1783. If one looks at, I think it's the Rutgers case that involved a brew house. There may be some claim from the person who is operating and taking possession of the brew house. But for people who come in and purchase drinks, they are used drinks. There's no suggestion in the act that those people who have, quote, used the property in any sense analogous to the cruise lines using the dock at Santiago de Cuba are liable. So if anything, that example, the applicability of which we've questioned in our brief in general given its interesting history, even under the terms of that act, it does not support this type of cause of action. Can I ask you one further tangible injury question? And you probably heard me ask this one in the first case. The statute does provide for this sort of authorization mechanism. Did the claimants have a right in Co-8 maybe, but a right under the statute, an interest under the statute, to the money that they would receive through the authorization process? And if so, is that a pocketbook injury? I do not believe so for several reasons. First of all, I think what that provision really does is create a defense, that you're not going to allow someone to come into court on this claim and on the merits, sue somebody who they had authorized to make use of the property. So that's where I think that factor is. That's a valuable, like, stick, right? Sticks and bundles. I mean, that's a valuable stick, right, that you have the ability as a claimant to authorize, and presumably you can charge for the authorization. I just don't view that provision as giving them a property right, but rather being a limitation on the claim, that if you have, in fact, authorized the use of the property, we're certainly not going to hear you on the merits to have a valid claim. I think to really be in a position to authorize use, you need to have control and possession of the property, which you don't have here. And so Congress is not, I think, able to create, and hasn't under this statute, a right to possession or a right to authorize use. I think that it exists as a defense in those circumstances where someone would be so brazen as to bring this claim, having already authorized the use by the particular defendant. Could you take five minutes, Mr. Singer, and address the statutory interpretation issues? Yes. I'd like to start with the discussion that Your Honor had with Appellant's Counsel, because I think that that answers the issue, which is that you have a statute which they would have to rewrite in order to get to the type of creative claim. I think that is its one virtue, it's creative, that this is not Dr. Bengocea bringing the action, but it's Pereno who serves as the United States national. Now, that fails, I think, at several different levels. I mean, first of all, that's not the case that was brought. Dr. Bengocea is the plaintiff. And it's not just a question of artful pleading or an application of waiver precedence. They have alleged that Bengocea owns the claim. That is a factual allegation. It's not just a legal theory. And nowhere does this legal representative idea appear anywhere on the complaint. So I don't think that that is even in the case presented to this court. Second, a theory is false on its facts. Bengocea does own the claim. It was inherited by Desiderio Pereno, Albert Pereno's brother. And that was in 1972. And then when Desiderio died in 2000, he arguably passed the claim on, again by devise, to his cousin Bengocea. So it's not a representative claim. This is something which has, in fact, passed along. But then we come to the third problem, which no matter what else is true, he cannot possibly qualify under a statute which says, and this is 6082A4B, it says, a United States national may not bring an action under this section on a claim to the confiscated property unless such national acquires ownership of the claim before March 12, 1996. So as the court indicated in its questions, there is a relationship between the use of United States national and such national later in the same sentence. It has to be Dr. Bengocea, the individual who seeks to bring the claim, who has acquired ownership of the claim before March 12, 1996. And I would note, because of the way that is worded, if acquire is not meant to include inheritance, then he doesn't have a claim to bring at all. And one doesn't even have to resolve the issue of whether inheritance is within the definition of acquire, because it says if you haven't acquired ownership of the claim, you can't bring a claim. Now, we think ownership is part of acquisition. And I'd like to address that now briefly. Everybody has gotten very used to using dictionaries to figure out the meaning of statutory words or terms. But every once in a while, you've got a word that has different meanings or at least different potential applications. And so in a case like this one where you have two possible ways of reading the word acquire, why isn't it given what we think the legislative purpose of Helms-Burton was, to read acquire in a way so as to not include inheritance? Fundamentally, because I don't think you have two equal commonly accepted definitions in the dictionary or in common usage. If we talk about the same source that the appellants have talked about, Black's Law Dictionary, it begins by saying acquire is to, and I'm quoting, quote, to gain by any means. To gain by any means. That includes inheritance. Now, true, it goes on to say usually by one's own exertion. But the definition begins by saying to gain by any means. And then it goes on to specifically say later in the definition that it includes, quote, taking by devise or inheritance. We also – I know, but that's because they quote a Supreme Court case where the definition included the word by devise. But I think they may have picked a better example if they wanted. But the point they're making and the service of the dictionary when people want to look up and say what does the word acquire mean, you learn that acquire means to include by devise. So I don't think it's – No, but if you look at other sources, right, and I know we could do this for days. But if you look at Webster's from 2000, the first definition is the Black second definition. So it's to get or gain by one's own efforts or actions. So you've got different sources, well-accepted sources, which treat the word acquire differently. And so the question is why is it not right in this context to read it so as to allow claims to be inherited? If you have no break – again, different case. If you have no break of U.S. nationality, right, so the only inheritance is from the U.S. national who owned the property when it was confiscated. That U.S. national moved to the United States after the revolution in Cuba, and then that person died and passed it on to his or her U.S. national offspring. What violence does it do to the scheme to allow that claim to be inherited? There may be other problems, but why is that an acquired problem? Well, I think the problem of inheritance is maybe exemplified by this case. You have Desiderio Pereno, who is not a U.S. national. He doesn't have a claim. So he decides, well, I'm going to make the choice to give it to someone, and it's someone who is a cousin who is a U.S. national, so he can bring the claim. And it's understandable that Congress doesn't want that type of action occurring. But you could take care of that problem by interpreting the scheme as a whole to require that there not be a break in the U.S. nationality chain of inheritance. Congress could have approached it that way, but instead they approached it in a simpler way, which they said that you have to have acquired the interest before 1996 in order to bring the claim. But another way of reading it, I think, is to say the reason to have the for value language in 4C is that you allow assignments for value before March 12th of 1996, but not after March 12th of 1996. So you could have had a Cuban national have his or her property confiscated, and that person transfer the property before Helms-Burton became law to a U.S. national, no problem. But you can't do it for value afterwards because then everybody knows Helms-Burton is law, and they don't want people creating a market for these claims and manipulating jurisdiction or plaintiff status. But there's a way to read this to make sense of all of this and allow inheritances without a nationality break to work. Well, if Congress really intended to do that, as they've done in other statutes, it would make sense for them to have said something like to acquire except by inheritance, or it could say something different in C. So if Congress wanted to do this, they knew how to do it. The point of the transfer for value is it shows that when Congress wanted to limit acquire to where it was transfers for value, they knew how to put words in. And I would also go back, if I might, to the key statutory languages of Section B, that if this is not an acquisition, there's no right to sue under the plain language of the statute because a U.S. national may not bring an action unless that national has acquired ownership. So if acquire doesn't mean by inheritance, he has not acquired ownership. Dr. Bengocea has not acquired ownership, so as to be able to bring a claim under the statutory section authorizing claims. So I think acquire has to be given a broad meaning. But if you look at 6086082A1A, which creates generally the cause of action, it doesn't use the word acquire. It says, shall be liable to any United States national who owns the claim to such property for money damages. That part doesn't use the word acquire. But it indicates, but there's a later section, though, which restricts the ability of courts to entertain claims, which is B. And it's written such that a U.S. national, which is Bengocea, may not bring an action unless such national acquired ownership or acquires ownership before March 12, 1996. So if you take the narrower… What subsection is that? Subsection B, 6082A4B. So if you use this narrow definition of acquire… That's the one we're talking about. Yes. If you use that narrow definition of acquire as not including ownership, then it says he may not bring an action. Unless he acquired ownership of the claim before March 12th. That's the provision, before March 12th of 1996. So acquire has to mean including inheritance, or else he cannot bring an action. And what it shows is that acquire either includes inheritance, in which case he didn't acquire it before 1996, or if it doesn't include inheritance, he can't bring a claim at all because he's never acquired ownership, which is what is required by this provision of the statute. And I would note, Your Honor, and this would be the last point on this, and I appreciate the court giving me additional time on this case. This is what this court said in Gonzales. This was clear and unambiguous language. This is what the Fifth Circuit said in Glenn. There's nothing in the language of those decisions that supports the distinction that appellant tries to draw between certified and uncertified claims. The court simply looked at the statutory language, said it was clear and unambiguous, and barred claims that by inheritance the plaintiff only got after March 12th, 1996. Lastly, and I'll rest on our briefs on this point, we think there is an additional flaw in the plaintiff's claim because it didn't own the property. It owned shares in a Cuban corporation, and you'd have to disregard that in order to have a claim that Dr. Bengocea has. Unless the court has other questions, submit the rest on our papers. We probably do, but there's only a limited amount of time. Thank you, Your Honor. Thank you, Mr. Singer. Okay, Mr. Gowdy, you can bring this marathon session to a close. You've got your full time for reflection. Come back tomorrow if you want to ask more questions. You've got a day to rest. You've got a day to rest. I'm going to start with the standing. Sorry. This is a tangible pocketbook injury, and it's important to understand confiscation. There's two components, one of which is not unlawful. A government may expropriate property. If the United States government tomorrow wanted to take Jaxport, which is a few miles from here, it could. But what it couldn't do is take it and not pay the owners of those facilities just compensation. International law is the same. Fidel Castro was allowed to take La Maritima, but what he couldn't do was take it without paying just compensation. And so the injury is not the taking. The injury is the lack of compensation. And that's what Castro hasn't paid and the Castro regime has not paid for over 60 years now. And the certified claims were done to certify how much the Castro regime owed those 5,900 Americans who had their property taken, not to give the property back to them. And I think understanding that injury is critical for all of your analysis under the statute and understanding. Start with... Let me say this. I'm sympathetic to your position with regard to at least injury in fact. Okay. Well, I won't spend a lot of time on it then. Well, that's only me. Three of us, but... And I am partly sympathetic to at least the acquired part of the statute. Right. When it comes to causation and traceability, the argument you've made now, if it gets accepted for standing purposes... Again, I speak only for myself. This is three or four cases down the road, but you've got all sorts of constitutional due process problems holding defendants liable regardless of culpability for the entire amount of taking no matter what their involvement is in trafficking these days. Well, I don't think I do, but I need to go down that road. Well, let me explain, because I've heard this unjust enrichment analogy, and Judge Ho latched onto that in the Fifth Circuit. And I heard the prior defendants make, I think, a somewhat valid criticism of that. The remedies afforded under the Libertard Act are not akin to unjust enrichment. We don't get... That's my point. Yes. So I need to stick with the remedies that are in the statute, which is the value of the property. This is not anything you've fought. I know that. You're dealing with a statute the way that we're dealing with it, too. I'm just saying... But it does make sense. And I don't believe that you have to go down the Spokio Road, as I said in my brief, because this is a tangible out-of-pocket injury. But I think it's helpful to think about those historical wrongs, which is, you know, whether it's trove or conversion with personal property, if I come and I steal your car, okay, then you, Judge Jordan, are entitled to sue me, the thief, for the value of the car. But the common law also said that if I took that car and I gave it to a third person who knew that I had stolen the car from you and they went ahead and used it, you could sue that third person. For the value of the car? Yes. Even though they gave it back to the original thief? It... I don't know. The last part, I don't follow you. It doesn't go back. A thief has a friend. Right. And the thief's friend says, Listen, I need a little money. Right. And I think I want to just become like an Uber Lyft driver for a day or two. Right. Can you give me your car? Sure. Yeah. So he becomes a Lyft driver for a day or two, takes four or five people to and from the Jacksonville Airport to downtown, and says, I made all the money I need to make. I'm done. I'm done with this Uber Lyft stuff. Gives the car back to the thief. Yes. And you sue the ubiquitous one-day Uber driver for the value of the car? Yes, if you can show he's an accessory after the fact. Yes. And... That seems odd to me. Well, I don't think it is odd, Your Honor, because... And in this case, it makes sense. Because... And this is why the certified claims are so different from the uncertified claims. The uncertified claimants don't have a right under international law to compensation. Sure they do. No. Because they have a right under Cuban law, maybe. But they don't have a right under international law. Your own case law says that. Because a sovereign can take from its own citizens. No, but you can be a U.S. national who never went through the certification process. But that's... You can be a U.S. national with an uncertified claim. But that's not... Most of the uncertified claimants were... I get your point generally, but it's an overstatement to say that an uncertified claim is permissible under international law. That's not right. I will say that a Cuban national who had their property taken from Castro did not have a claim under international law. Agreed. Okay. And that is... Uncertified claims that have now become case law, that's the fact... I get that too, but that doesn't mean that every uncertified claim... Okay, I agree. It was an overstatement. What I meant by that was every uncertified claim that was originally held by a Cuban does not have a claim. And so the argument they've been making is this unjust enrichment argument. But that's not what you get under the statute. We don't get the value of the tickets that the cruise lines sold to their passengers for using the ports. What we get is the compensation that Castro and the Cuban government is supposed to pay the Americans who had their property taken. And what Congress found in the statute for your traceability element, in which this court, I don't think, can second-guess as judges as opposed to the political branches, is that these corporations and commercial activities enable Cuba to avoid its responsibilities under international law to repay the certified claimants. And that is the traceability. And it's been going on... Their using the property prevents the claims settlement mechanism that's under the Claims Act from using... I'm sorry, from operating. I know over my time, I did want to address... I don't know if Judge Newsom or Judge Burke have questions on the standing, but I did want to just get to the statute briefly again, if I could. I think we've got your position. Okay. We've taken you and Mr. Singer way over, and you've been very gracious with us, but we've got to go back and try to figure this out. You're so gracious to let us go over. Thank you, Your Honor. Okay. All right, we're in recess until tomorrow. Thank you both very much. Thank you.